May it please the Court, I am Richard Mazur, and I am counsel for Alan Sully. With the Court's permission, I would save and reserve five minutes for rebuttal. Thank you. This is a death penalty appeal in which trial counsel failed to investigate powerful evidence admissible at both the guilt and penalty phases. The evidence consisted of serious mental health issues and extreme intoxication by freebasing cocaine during the chorus of the homicides that took place in this case. I'm a new person on the panel, so I've just been through all the data, and it's a little strange to say he didn't investigate it. He did have mental health consultants during the trial, and he had a, and certainly the fact that he was freebasing huge quantities of cocaine was all over the trial. I understand that there was no specific testimony regarding the effect, the sort of cumulative effect of cocaine, but that was sort of about it, wasn't it? No. Tell me more. Quickly, Your Honor, it was not. Two points. He hired a psychiatrist as Dr. Grassi, and Dr. Grassi's declaration is in the excerpts of the record. And what Dr. Grassi says very clearly is that he was hired for a specific purpose, and that was to keep a lid on Sully because trial counsel thought Sully might act out during the trial. But he specifically was never asked to perform any forensic evaluation of Mr. Sully. He was not asked to look at whatever symptoms he observed, and he observed many, and to put them into some sort of a report and evaluate what he saw as the symptoms against the standards. In other words, there was no forensic evaluation as to whether it would constitute defense to an element of the charges of guilt or mitigating evidence under the California Penal Code at penalty. So there was no investigation. We're not even sure how aware he was of these facts, because if one looks at Dr. Grassi's billing records, Grassi saw Mr. Sully approximately 50 times before and during the trial for a total of 150 hours. And the only meeting in the billing records is when he was first engaged and met with Mr. Gray. So there was no mental health investigation, and yet the mental health was staring him in the face, because why would you hire a psychiatrist to try and clamp down the defendant unless you were worried that there were mental health issues? It wouldn't make any sense. Second, as to the cocaine, the cocaine was not all over the case. What was in the case about cocaine came from Dr. Cohn, and when one reads Dr. Cohn's testimony, which I invite the court to read, the testimony is he's asked abstract questions. None of the questions address the specifics of Sully's case. In other words, there is no discussion of the frequency of usage, how much he was using. But Sully himself testified at some length. That's right. The fact that he was using it all the time. Well, Your Honor, my honest opinion of that, when a man is addicted to freebasing cocaine and you ask him how much did it affect you, it's a little like asking a drunk how you're driving. As to the fact that he was using it all the time, that was clear. Yes, but the legal effect wasn't. I mean, the medical effect, I should say, was not on that. In order, if Dr. Cohn had said, okay, I examined Sully, or I read the material about the amount of use that Sully was doing, and it's my opinion that knowing that information that it had no impact on Sully, it was like a cup of coffee, as Dr. Cohn testified, that would be one thing. But it wasn't. None of that was in there. Counsel did his level best to hide both the effects of the cocaine and the effects of the mental illness from the jury, and he succeeded. He kept it out of the guilt phase, and he didn't use it in the penalty phase. Worse, he allowed Sully to engage in a performance-laden outburst at the reading of the verdicts at the guilt phase. He knew about it. He set it up with the court. Well, wait a minute. He knew about it, and he warned people. What is the evidence that he... Yes, it is. Judge Belier, who was co-counsel, his declaration discusses that. If I could have a minute. I'm a little worried about Belier's declaration. In order to accept a declaration, you've got to have some foundation. Otherwise, it's just speculation. As I understand Belier's testimony, he didn't participate in the preparation of the penalty phase of the litigation. He arrived four months before trial. By that time, likely any discussion about what they do on the defense and the strategy would have been done. He admits he rarely, if ever, visited Sully at the jail until the penalty phase. I guess I'm having a tough time understanding what foundation he has for what I'm trying to think about. Well, his foundation was that he was second counsel. He was second counsel coming to the party just, what, four months before trial? That's right. So all of the decision-making about what had to happen in the case was done. He was just there to help do what they'd already decided. He rarely, if ever, visited Sully at the jail, even before the trial. It wasn't until the penalty phase he even went out there. What foundation does he have to say what happened between Sully and his counsel? Well, certainly with regards to answer the specific question that Judge Brisson asked, paragraph 13 at page 538 of the excerpts discusses that particular issue. And Mr. Bailie says that Sully had planned to vent his feelings and tell the jury what he thought of them if they found him guilty of any offense. Gray had informed the judge and discussed with the deputies Mr. Sully's intention. I, Bailie, told Mr. Gray I believed this was not a good idea and could not see any advantage to Sully acting out. Gray went ahead and let Sully follow through with his plan. I don't really understand what – I mean, it's a coyly word paragraph, but it still doesn't negate the possibility that Gray knew this was going to happen and that Sully was intent on doing it and that the only way to stop him from doing it was to get him out of the courtroom before he actually did anything that was supposed to happen. Well, Your Honor, that is certainly one thing that would have to be considered. My point is this. This case was decided on summary judgment. There is no factual record developed either in the state court or in the federal court. We're looking at declarations, and Judge Smith raises a question, and it's a fair question. How much credibility can one give to Bailie? And I think that's true about credibility, about the foundation for testimony. That's a different question than credibility. That's foundation, whether he testifies at all, not whether he's credible or not. Well, he certainly has a foundation on this issue. Well, he has a foundation for everything that happened four months before the trial, if he had any specific involvement, but then we find out he didn't even go out and see Sully. Well, Your Honor. So Gray's conversations to Sully, he has absolutely no foundation about that. Except what perhaps Gray told him. No, all he says is that he was unaware of any discussion regarding potential consequences and the downside of this claim. That's all he says. Well, I guess maybe I'm talking across purposes with the Court. Because what I see is this. These are declarations, and, of course, they provide a foundation to a claim. But it seems to me, if on questions like this, the best way, the preferred way ought to be there should have been an evidentiary hearing somewhere, either in the state court or in the federal court, where people could testify. And it's the same thing. It's not just Bailier. It's Grassi, Dr. Grassi, who's the psychiatrist, who says that Gray never asked him about any of the symptoms that he observed and lists the symptoms of major mental illness that he observed in Sully over the 150 times he saw him. Now, the government says, well, that's not really the whole story. The government, in their informal response in state court, says, well, he had a psychiatrist, as if that answers the question. Hiring an expert but not using the expert's expertise to conduct a proper investigation and to test it against the appropriate standards, whether they're legal or medical or psychiatric, that's not a competent investigation. And you can't make a strategic choice in this case without having made a competent mitigation investigation, and that's what Gray did not do in this case. With respect to Dr. Allen, is that his name, Allen? Dr. Ehlen, who did the testing, yes. One thing I noticed is that his reports say that when he went, when he interviewed Sully, which was twice, his lawyer was there both times. That certainly suggests the lawyer had some idea that this was happening and some interest in his outcome. And their assumption seems to be that the lawyer didn't, that Gray didn't know what the report was, but that seems like a strange inference if he bothered to go to the hearings twice, to the meetings twice. Well, my information, and if I missed something, it's my fault. My information comes from Grassi, and Grassi says he did not know if Ehlen spoke to. I mean, he didn't know, but if you read the report, it says the lawyer was there. He sent it to the lawyer. No, it says the lawyer was there. Was present. Okay. Well, let's assume for the sake of argument that, and I think it's a fair assumption, there's serious mental issues here that weren't fully explored. But as I read through the, especially the closing argument in the penalty phase, it appeared to me that the strategy was he wanted this defendant to look calm. He wanted the jury to think he didn't do it, and he pursued that until the end. Particularly hiring somebody to keep his emotions under control indicates to me he thought there were some problems, but his best shot was an innocence defense. And he carried through the penalty phase, and if you've got any doubt, even a little doubt, then life in prison is better than an irreparable verdict. So, assuming it's strategic, why isn't that insulated under Strickland? Well, I think that the basic law from Strickland ever on, starting with Strickland, amplified in Wiggins, is the duty of trial counsel to investigate. And if he made a decision, and I think the record fully reflects that Gray made a decision to do factual innocence, put Sully out, have Sully testify, bolster the defense that Sully didn't do it by calling Dr. Cohn and very carefully taking the cocaine out of the case as a causal effect. Because Dr. Cohn testified, it's like a cup of coffee, it doesn't last very long, and in the abstract that may be true, but it wasn't true in Sully's case. My assumption was it wasn't so much to get the cocaine out of the case as a causal effect as to get the cocaine out of the case that was something that was distorting Sully's ability to say what happened. Because, in other words...  In other words, to, given all the testimony about him rebasing cocaine all the time, to give some support to what he was saying happened, and to negate the possibility that he just didn't know what happened because he was so high all the time. That was my reasoning. Well, the testimony went way beyond that. It had a lot to do with the question of, can a person who takes cocaine engage in planned aggression, or would it affect his ability to engage in planned aggression? Those issues were all brought out on direct exam, and the idea that trial counsel was trying to persuade the jury of is, well, in addition to supporting his testimony, is that taking the cocaine would have no effect on him at all. Obviously, there's a very strange circumstance here, which is the trial counsel dies soon after trial, so nobody really knows what he was thinking, but could he have been thinking just more globally? These were such terrible crimes, and there were so many of them, and they were over a large period, and there were other things he did too that would be considered awful, that unless he, if he actually did them, he had no prayer of avoiding the death penalty. And therefore, he was, he was decided on balance to go with the innocence claim. Respectfully, Your Honor, he decided before he did any investigation, and that is not a sound strategic decision. Obviously, he knew that the man had mental health problems, where he wouldn't have hired the forensic doctor, as you said. But he certainly knew that he was smoking, that he was freebasing an awful lot of cocaine because his client said so. So those two facts were, I mean, unlike a lot of these other cases in which there's a lot of historical information that they just don't have, there was no basic information that he didn't have. He just didn't decide to go with it. Respectfully, we disagree on the analysis of what that is. And, Your Honor, I understand in light of the facts of this case, the penalty phase offered no explanation for how Sully, who had never been in trouble until the age of 39, and lived a pretty law-abiding, productive life, at the age of 39, he starts freebasing cocaine and engaging with letting people into his life of different kind that had been into his life before, and all of these things happen. And what explains the conduct, and what is mitigating about the conduct, mitigates the conduct of the drugs, and he buried that. In one of your briefs, you did a very nice job of saying, you know, what would the penalty phase have looked like if he had done it this way. And he could have done it even after the factual innocence, before the defense. But the, it's still true that he, even if he had done it, he still had an enormous uphill battle. And that's not to prejudge the penalty question, the prejudice question, but it's to say, even if he had proved all that, he still had an enormous uphill battle. So the question is, did it nonetheless make sense to put one's eggs in the innocent's basket, and did that entail something like Dr. Cohn's testimony, which then made it harder to do the other later? It didn't make any sense. To be honest, it didn't make any sense. The very nature of the overwhelming, aggravating circumstances that the attorney general consistently points out, is the reason why putting on the mitigation of the drugs and the mental health issues explains it. And it changes the nature of the government's argument at penalty phase. It couldn't say, as they did in this case, there's no issue with regard to mental illness here. That's not in the case. When there was huge issues with regard to mental illness, which is one of the major factors recognized by the California Penal Code, along with addiction to drugs, as mitigating evidence. And it changes the entire scale, the picture of what the penalty phase would look like. We don't have to prove we would have won. We've got to prove that talking about lingering doubt in a case like this, respectfully, is an insult to a jury, in my opinion, in this case. I suppose. But the theme of it, going all through this, is, look, I've got to portray this guy as a good guy.  And that penalty phase approach that emphasized mental illness, freebasing cocaine, and explaining violence, particularly with cross-examination, is inconsistent with that. And it's not going to work. It is inconsistent. It's explanatory. When you get to the penalty phase of a case like this, it's really easy, Your Honor. I do these cases. You stand up and you say to the jury, this is your decision. You made this decision. And we honor your decision. We're not asking you to look back on what you decided. But let us now talk about a different question, the narrow question of life without versus death. And I'm going to explain to you what you did not hear with the guilt phase of this case, about why this happened, not because it excuses it at all, but because it is the human factors and the failings of human beings, which is the essence of what mitigation, evidence, and a penalty phase is all about. And it was here in spades. And it stared him in the eye. And he looked away and buried it. Let me ask you this. I mean, we've heard these arguments prior when we were at the hearing. Now we have pinholster directly on point here. Not at all. Well, tell me how it's not. It seems to me that in pinholster we have the same exact kind of circumstances. I mean, we've got a situation here where somebody's getting argues that somebody failed to investigate and present evidence of mental disorders. The district court granted habeas relief on that issue. We affirmed. And it went up. And the Supreme Court said Ninth Circuit's out to lunch again. Why is this not another pinholster? We'll get the same result. I think pinholster, one of the questions is what facts were presented to the federal court that were not presented to the state court? I mean, isn't the essence of pinholster saying that when the same facts are presented to the state court as were presented to the federal court, that pinholster doesn't control? That's my understanding of that case. And here in our case. Is that the way you distinguish it? Yes. And here in this case. And if I don't agree? If you don't agree, then you're the judge. Well, my worry is that that isn't what happened at all. Okay. Okay. I just wanted to know how you were going to try to distinguish it. There is. Basically, it's that the evidence in pinholster you thought was redundant. I'm sorry. Could you repeat that, please? The court said it was redundant. The court said that the evidence in pinholster was redundant. And you think, and this isn't redundant. Is that the main way you're distinguishing it? Well, the evidence was the same in state court as in federal court. Well, it said it was. Obviously, the Ninth Circuit didn't think it was. Or the Ninth Circuit back panel didn't think it was. In our case. In my case, I'm talking about. I'm not talking about pinholster. In my case, there was no evidence that solely represented everything to the state court represented to the federal court. Oh, I see what you're saying. I guess that's what I'm trying to say. Maybe I didn't say it very well. I see what you're saying. You're not talking about the difference between the original trial and the habeas. You're talking about the state habeas and the federal. Correct. Correct. Well, my worry on this is, again, I'm trying to. I'm second-guessing the state court. And I'm trying to. I've got a standard to review for second-guessing the state. And I saw a pinholster. And I saw what happened when the state court had that evidence presented. And the state court said no. Then it came to the district court. And we made a quite different decision based on similar-type argument. And the Supreme Court said belonging. To me, the interesting question and hard question about pinholster, which this case exemplifies, is that you would want to know more. These are affidavit declarations. And there's all sorts of holes in them. And one would want to know more. And this is, I gather, why you were arguing so vigorously for an evidentiary hearing earlier. But pinholster seems to shut that down, at least as to the federal court holding an evidentiary hearing. So then the question is, is there some way to question the reasonableness? I'm not getting more abstract than what we've done so far. The reasonableness of the state court determination, essentially not to hold a hearing. In other words, is there some argument that this should have at least been enough to get further development? But it can't be in the federal court anymore, as I read pinholster. So how do we get it to be in the state court? Well, by determining that the state court decision is not correct. And here's how. But whether it's unreasonable depends on which way the holes get filled out. Let's say. I mean, maybe it's unreasonable altogether, or maybe it's not unreasonable. But one third possibility is that whether it's reasonable or unreasonable. I mean, for example, there's a lot of material that isn't here. There's not a whole lot about his career as a policeman. There's not a, as I said, Grossi. You say you can tell from the billing that Grossi didn't talk to Gray, but Grossi doesn't say he didn't talk to Gray. He could have talked to him and not billed it. We don't know whether Grossi was talking to Gray. I suspect he was talking to Gray, but we don't know. We do know that Ellen was talking to, it says lawyer. It doesn't say which lawyer, but one of the lawyers, because that's in his report. So you're making one assumption about what this is, and you can make the opposite assumption, and what do you do with that? Well, a couple points. I think that both with regard to the IAC, under 2254 D1 and D2, I think we can get back to state court. I think we can show that the state court decision, I think, was unreasonable. And our argument is we made a prima facie case of ineffective assistance to counsel. Unless one thinks. Yes, one thinks. I'm not entitled to assume that you could have gotten Grossi to say he didn't talk to Gray, just to use a concrete example. Yes. But it doesn't say that, so therefore it's not unreasonable for the state court to leave that fact, not to assume that he didn't talk to him, but to assume that he did talk to him, or not to assume anything about it. Okay. There's a second argument. I think, therefore, that it's not unreasonable to think that the likely inference here is that whatever Grossi's general impressions of his mental health was known to Gray. There's a second way we could do it, and that is the California courts apply a different and more restrictive standard for ineffective assistance to counsel that is contrary to clearly established federal law. And there's three points there. One, regarding prejudice. There's a different standard. The California court imposes a higher standard, because under Strickland, defense counsel does not have to show that counsel's deficiencies resulted in a fundamentally unfair proceeding. And that's Williams v. Taylor. But under state court, habeas counsel in state court must not only show a probability of a different outcome, but that counsel's deficiency caused the trial to be fundamentally unfair. And that's Harris, Valdez, and Hardy. Second, there's a presumption under California law in collateral proceedings, a special presumption of correctness in the conviction that is not applied when ineffective assistance of counsel is raised on direct appeal under Duval. Under federal law, Strickland holds that no special standard should apply when reviewing IAC in collateral proceedings, and the reviewing court should apply the IAC test no differently than if it were raised on direct appeal. And third, the cumulative IAC error standard. Under California law, the state analyzes the prejudicial effects of each ineffective assistance of counsel case separately rather than cumulatively. That's Robbins. And under federal court — Is this your brief? Pardon? Yes. I think that's why pinholster is especially appropriate here. Thanks. Excuse me. Pinholster is a California case. Yes, it is. And we talked about one holding in pinholster that the Supreme Court got to. We really haven't talked about the second. And that was that given the weight of the aggravating evidence, there is no reasonable probability that the additional evidence he presented would have changed the jury's verdict. This case is so horrific, pinholster looks like nothing. I mean, this is a situation where we've got six people murdered, tortured three of them, brutally beaten and raped another, imprisoned another. It seems to me that all you said about ineffective assistance of counsel in California law didn't seem to apply to the Supreme Court. They said, the weight of the aggravating evidence, there's just no chance this is going to change. And this case is a lot worse than pinholster. This looks more like Woodford versus Viscotti, the California case where there was a cold-blooded execution. And at that point, the California said, no, it's not going to change. And the Supreme Court says, you're absolutely right. What do I do about that? Well, I guess what you do about that is you put on the rose-colored glasses that I've been wearing for the last 25 years and view the fact that the only reason to have a penalty phase, I mean, if you get that done with the guilt phase and the jury convicts in a case with all these homicides, you might as well just send them away with no penalty phase. That's what, in essence, the courts say when they say that no one can save Sully and that it's just the aggravating evidence is too bad. My answer is the same answer I gave you before. You can't – there's nothing to be done about the fact that these people are dead. It's awful. But what you have to do, if you're a defense counsel, is in the case for life, order a – have a reasonable argument why death is not the only appropriate punishment. And that if you can show the reasons why this person engaged in these acts and you can show that this person could be manageable in prison when not under the influence of these drugs and where mental – his mental health could be treated and would not be a problem in prison just as Sully has been for the last 25 years, that that's a case for life. And the – there's no aggravating – there's no substantial aggravating evidence put in the penalty phase in Sully's case. It all came in through the guilt phase. There's the baby ducks. Well, there was the set of threats against the wife. And it seems to me that's most pertinent to is to some degree undermining the impact of the cocaine because that was long before it was – I didn't say it was – it was not. It is – I'm not minimizing that, but I think that the government's case in aggravation, when one looks at the whole case, consisted of the murderers and the other people who were brought – to the other women who were brought to the warehouse and nothing – and they escaped or they were let go by Sully, depending on the circumstances. But the point is that was the major aggravating fact, is the heinousness, as the government calls it. That Sully's a monster. But you can show how Sully's not a monster. You can show Sully has different qualities by explaining. And I guess I'm repeating myself to the point that I'm way over my time, I notice, and I appreciate very much you giving me this opportunity to go over my time and to discuss this with you. Thank you very much. Thank you. Good afternoon. May it please the Court. Greg Zewiecki on behalf of the people, State of California, and Warden Ayers. There were three reasons why – three primary reasons – why the district court correctly denied the petition. First, there were no material dispute of facts. This was spin, nothing more. Yeah, there were a lot of facts that were added to the record on habeas, but this was spin, nothing more.  I'm not sure I understand what you mean by that. In fact, it is true that the jury did not hear any – it didn't hear – let's concentrate on the penalty phase now. It did not hear in the penalty phase. I mean, not only about the possible cumulative effect of the amount of cocaine he was taking and whatever underlying mental health issues he had. Now, the mental health issues didn't necessarily seem extreme, but they were there according to several doctors who dealt with him. Some of them said it was schizophrenia. Some of them said it was either schizophrenia or personality disorder. But there was something there, and there was a lot of depression and so on. But the whole notion of cocaine psychosis was not there. But also, there was no general narrative in the penalty phase that said, this man was a Coast Guard, and he was a successful Coast Guard. He was a policeman. He was apparently a successful policeman. And then something happened quite late in his life, and he started taking a lot of drugs, and that has a certain kind of impact on him. And he is not a person who has lived – he basically lived a fairly normal and good life until all of this. The narrative wasn't there in the penalty phase. So, I mean, to say it's all spin, I mean, maybe you'd call that spin, but it's the important piece that all the jury heard was, you know, there are some people who thought he was a nice guy and were surprised he was arrested for murder. Your Honor, the spin comes in the nature of the evidence and how it was asked to be used. It's an excuse. It's an excuse defense. Excuse him for committing these horrendous crimes. He happened to be under the addiction of cocaine. There was never a complaint that he was intoxicated. Well, it's fairly an excuse. It can be a more profound moral statement that says, you know, this man for most of his life was not an aberrational person, and for the rest of his life he won't be either. You know, and why put him to death when that's a very major thing to be doing? It's not going to accomplish anything. It's not going to bring any of these people back and so on. As the district court described it, such a defense would have been duplicitous in the extreme, and the reason for that, which we have not talked about this afternoon, is because Mr. Sully got up on the stand and testified. He testified at length with coherence, and he denied his involvement in the crimes. Now, Dr. Cohen was specifically brought into the case for the purpose of bolstering Sully's testimony to explain that while Mr. Sully may have been taking cocaine and taking massive amounts of cocaine, even Mr. Sully said what he liked to do was chase women and do dope. While he may have been under, while he may have been taking cocaine often. He said that in an interview. Was that in the transcript? I believe that came into the trial. It did not come in during his testimony. It may have come in to cross-examine him, but he did, counsel was definitely aware of that, and I believe that in our brief we have cited where that came from. Counsel was aware of it, but you're saying that the jury was aware of it. I'm not sure it was, but anyway, go ahead. I believe in our initial open, or our initial appellee's brief, we had cited the page where he specifically said that. But the idea is this. He testified, and with that testimony, counsel's choices, as the district court found, were somewhat limited. Could he have put on an alternate defense that was, as the court said, duplicitous? Possibly. Was that the only defense he could have put on? No. Not by any means. In this particular case, Ms. I'm sorry to keep having you explain your terms. The guilt phase might have been duplicitous, but why would the penalty phase have been duplicitous? Because the same jury heard the guilt phase and the penalty phase. Had they been asked to look at the character of Mr. Sully under a new light, saying, oh, okay, well, yeah, now he did it. We admit that. He was lying to you on the stand. I'm sure you needed to do that, or they needed to do that, because they, I mean, whatever he was doing during those two years he was smoking cocaine, it wasn't good. Whether he was murdering people or just living a completely deathly useful life, he had obviously fallen apart one way or another. So they could have put on the falling apart, not seeming duplicitous, it seems to me. But again, that would have undermined any claim that he had to a residual doubt defense. Now, the evidence in this case was very strong. Admittedly, a residual doubt case was difficult by itself. It was not presented by itself, however. In this case, they presented a humanizing defense. They found the few people they could that were willing to testify on Mr. Sully's behalf. They examined the record. They looked through Mr. Sully's history. They told somewhat of a historical perspective about him. And that was about the best that could have been done under these particular circumstances. Now, again, this was in light of his lengthy, coherent testimony. Why is that inconsistent though? I just don't understand why it would be inconsistent to say, look, we know that you didn't believe him. We know that you've convicted. We accept it. But here we have a guy who has mental problems and he has severe cocaine addiction, which may affect his performance. And without even addressing whether or not he did it or not. I mean, that's not a recognized attention. But, boy, just to say, you found beyond a reasonable doubt that he was guilty, but we hope there's this little bit of a doubt that you still have. It's pretty weak. Pretty weak. Your Honor, I have three points in response to that. First, addiction evidence itself, as this Court has stated in more than one opinion, is just not that strong. The District Court recognized that in positing the explanations that the Supreme Court, the California Supreme Court, would have used or could have used in denying the petition without getting to a factual dispute, a material factual dispute. Not only in this particular case was the addiction evidence not that strong, but the aggravating evidence in this case, even putting aside the ducts, because the guilt phase evidence was usable and considered by the jury. Actually, the ducts seems to me you're of a blue. But the threats, the very graphic and specific threats that come so on, seems to me I thought that the main point of them might have been to undermine the notion that it was the cocaine that was doing this because this was long before the cocaine. Exactly, Your Honor. It was not necessarily the acts themselves, although the acts were pretty egregious, and threats against his daughter saying you're going to find her in a little box. I was a police officer. I know how to do these things so that nobody will find them. Counsel, I believe, also was aware that Mr. Sully's departure from the force was not necessarily under good circumstances. I don't believe that came in front of the jury, but counsel was aware of that fact. So the fact that he was a police officer could have come in. I know that there was this discussion about this, but also I assume this whole situation with his wife where his wife ended up going to the Millbrae police while he was still in the police force. Yes, Your Honor. It wouldn't have been so favorable either. Yes. But if you're trying to put on evidence that excuses this or in some way explains this, if it's maybe not an excuse, if you were to put that evidence on, it's not that strong to start with, but you've got a mountain of aggravating evidence against it. You have to somehow use this to explain things, and the evidence itself was not there. Looking through George Wood's declaration, there is no actual diagnosis. There is simply the disagreement with Dr. Cohen, who is a notable expert. Even Dr. Woods, I think, agrees that he was a very noted expert and testified numerous times at trial. There wasn't so much a disagreement. It was that he either didn't have or didn't use the information in terms of how much cocaine he was freebasing. In other words, he was treating it as if this was an intermittent, occasional use, but he had written a lot about how huge amounts can actually have a different impact, and that didn't seem to be taken into account. And is that not Dr. Cohen's fault at all? Your Honor, it was not Dr. Cohen's fault. It was counsel's strategic decision. Counsel intended to bolster Mr. Sully's testimony. Mr. Sully was adamant about trying to obtain an acquittal. How do we know that? If nothing else, his outburst after the guilt phase showed his feelings for this. One couldn't really figure out what that was. It could have been that he found it in his head, or even his lawyer got it in his head, that if he yelled, you know, I didn't do the crime, that that was in an emotional voice, that that would have some persuasive power at the penalty phase. Your Honor, there was no declaration from Counsel Gray in this case. So we don't know precisely what Counsel Gray was thinking. And we have to define that, infer that from the record, which is exactly what the district court and the California Supreme Court had to do in determining that there was no prima facie case here. They had to figure out, is this a reasonable decision, and did he make a reasonable decision not to investigate further? Richter specifically says that counsel can avoid distractions where counsel makes reasonable decisions. This was a reasonable decision in light of Mr. Sully's testimony. Well, the hardest part we have here in my book is this, for you. This is a failure to investigate and a failure to present mitigating evidence. If I look at what counsel presented in this phase, it seems to ring true that what counsel's affidavit may not have foundation is true. I mean, he didn't even give an opening statement. He called ten witnesses, including a deputy district attorney who testified that Sully deserved the death penalty. And then most of the witnesses didn't even answer many questions. I mean, the crux of all of this was that Sully was a nice guy and that people were surprised. If I read what California says about mitigating factors, it isn't even in there. Now, if I look at what he did, how can I suggest that he prepared? How can I come to the same decision as the California court that he prepared when he didn't even give the mitigating factors California suggests he ought to give? California actually has an additional factor, factor K, that permits all evidence that would go towards mitigation. If it comes in, it could come in under that. But the people he presented didn't even know him very well. They were like, you know, people who cleaned his, who drove his truck or something. Your Honor. And actually, the wax tap thing was really egregious. I mean, I couldn't think, I mean, that thing should be the explanation to fall flat. Pardon me. I missed that, Your Honor. It was a wax tap. That just seems totally egregious. It makes not a bit of sense. What did he think was going to happen? He put him on there to somehow show the jury that others were also responsible for this. Mr. Sully had claimed through. They knew that. Not necessarily that the others had been prosecuted for it, although I think some of the evidence had come in, but not all of it. And that the decision, yes, there was some risk to it, no doubt about it. Some risk. I mean, it was an absolutely predictable risk of exactly what happened. It also had some benefits. And in this case, it was a difficult penalty case. There's no doubt about that. This was a mountain of aggravating evidence. What was the benefit? So that the jury would know that guilt was not solely done through Mr. Sully. Well, they knew that. So the only possibility would be that somehow it wasn't fair that somebody who had done three of the murders was not getting the death penalty. He had been involved in three of the murders, but A, he had done six. And moreover, there was going to have to be an explanation. I mean, obviously they were going to get up there and they were going to give a reason. So it's just inexplicable how it could have played well. The fact that counsel's decision may have been incorrect, and I'm not saying it was, but I'm saying it could have been, that does not control here. The question is, as the Supreme Court said in Richter, the reliance on the harsh light of hindsight is exactly what the AEDPA seeks to prevent. And that's exactly what has to happen in order to review this. You're looking at hindsight, something that happened 20 years ago. I mean, the failure to investigate or the failure to present mitigating evidence is one of those things that the court will reverse. I mean, we've got a lot of things people can argue about that they won't reverse. But the failure to investigate, they will reverse. And as I cited, some of the factors. I mean, you can add other factors. There was one witness who didn't even know what phase she was testifying at. And when I look at his closing argument, I mean, I could have given a better closing argument not knowing nothing about it. I have a tough time understanding how this shows he investigated and presented. Your Honor, he was entitled to make reasonable decisions that made certain lines of investigation unnecessary. And in this particular case, the minute that Mr. Sully testified, got up on the stand at length and denied it. You're essentially saying he was entitled to take the view that if he couldn't get him out and dealt, it was a hopeless case. I mean, that's pretty much what you're saying. And it may be true, but that's pretty much what you're saying. Is that one possible strategic decision or at least line of strategic decisions that counsel may have taken? He may have thought that. I think faced with this evidence, it's reasonable for him to think that. I don't think that was the only decision, though. He had a very unsympathetic client. He could have chosen a number of different defenses. He chose one to humanize and at least play on any residual doubt that may have remained. In this particular case, the question is not just, was it reasonable? The question is, was the California Supreme Court's decision finding it reasonable objectively unreasonable? This court, as well as the United States Supreme Court, have upheld cases from Strickland on, where little, if any, investigation has been done. Strickland, Darden. Cases where, as in Pinholster, things were essentially not going to happen the way the defendant wanted them to in the penalty phase if you got there. Strickland itself said that some offenses are so egregious that by their very nature, any mitigating evidence would not overcome the mountain of aggravation. Strickland only killed three in a 10-day spree, and he did it for financial reasons and to hide himself. Mr. Sully, in this case, killed six and tortured psychologically and physically, scarred others for life, and he did it because he enjoyed it. Now, in this particular case, there was very little that could have put on that would have changed the outcome. I can't imagine anything that actually would have been that would have changed the outcome. But that, again, is not the decision. That's not the question. The question is whether under Pinholster, under the ADPA, the California Supreme Court's decision was reasonable. Putting on evidence trying to explain something, explain why someone did such horrendous conduct, as the district court said, may have done more harm than good. How could that be? It would have emphasized. I mean, he got the death penalty. I mean, you know what? What else could have? It would have taken away any chance he could have argued for mercy, argued for residual doubt. Again, these are. . . Pinholster argued for mercy. That doesn't require any evidence. No, Your Honor, it does not. But it does require the jury's view of the defendant. What bothers me, I think, is the same thing that bothers all of us, is that if you have a reasoned decision based on a complete investigation, then that's one thing. But we have just little hints that he was getting. . . We know it was obvious that he had mental health problems, and there's little hints that he was consulting, but nothing. . . He didn't ask anybody, do you have a diagnosis for him? And to think whether or not that diagnosis, independent of anything that was presented at trial, might be of assistance in the penalty phase. And that's bothersome. You just missed this. I mean, that's the failure to nail down the investigation that the Supreme Court has said is still important. You've got Wiggins and all those cases talk about that. . . But Wiggins and California's wisdom in setting up mitigation factors is wisdom. But again, Your Honor, we're back to Strickland as the primary standard, because Wiggins was decided after the California Supreme Court decided this case. And Wiggins involved a. . . But I think Wiggins was consistent. Wiggins was consistent with the prior round, don't you think? Your Honor, we're not saying that counsel didn't have some duty to investigate things. The record is replete with evidence that Mr. Sully was addicted to cocaine. It's also not disputed that he calmly sat there at his piano freebasing cocaine as Michael Francis torched the fingers of Catherine Barrett and had attempted to kill her. It's only at that point that his testimony diverges and he took a sledgehammer to her. But there's no dispute that there was plenty of cocaine evidence in this. But unlike many of the other cases, and I would cite Belmontes v. Wong in particular, this is a case that was nothing but needless suffering. Belmontes v. Wong had no needless suffering. This is a case that had so much that it's hard to fathom how any evidence could ever have changed the vote of even a single juror. What he did to Gloria Frivel, Brenda Oakden, Barbara Searcy, Phyllis Melendez, Michael Thomas, and Catherine Barrett is simply unthinkable. He did this to numerous others, and it was only through fortuity that he got away with it. He should not be allowed to get away with it here. Counsel did exactly as counsel could have done under these facts, including the entire trial record, and counsel had to take into account the entire trial record, as did the California Supreme Court. The California Supreme Court reasonably denied his claim. There was no need for an evidentiary hearing because there was no prima facie case shown. The district court found that. Can I ask a question? I mean, that seems to go from passion to abstraction. How do you understand penhole should operate in this circumstance? California has a standard for what you have to show to get a hearing, and it's not everything. I mean, it's a prima facie case, whatever that means. And obviously, bare pieces of paper are not going to have all the details. And we don't want them to have all the details. So, I mean, I was talking to your opponent a little while ago about some holes that I would like to know, which would help me decide this case, which you could either make assumptions about what were in the holes, or you could have a hearing and find out what was in the holes, i.e. did Grasso talk to Gray or not? We don't know about his overall impressions. I mean, you speculated in your brief, and I think you could be right that, in fact, this story about he was really not hired to do forensics was a little bit of a manipulation in order to avoid discovery, and he was really being hired to see if it was worth doing a formal study. But we don't know that. Okay. So what – if you can't have a federal court hearing, then how do we judge what the state court did? We just look at the facts and say, does this make out the whole case? Or we look at the facts and say, does this make out enough of a case that they should have had a hearing? Under Penholster, you do exactly what you – the former. The former? This is the case. That doesn't make very much sense. Pardon me? But that doesn't make a lot of sense because this kind of record is never meant to be the whole story. There are very few cases where you're going to have the complete record on appeal, and this is one of them that we may never have. But under Penholster and under the AEDPA, this court is required to look at exactly what the California Supreme Court was looking at at the time the court made its decision. Let's assume for the sake of argument that a state had a rule that you could never have an evidentiary hearing on a collateral review. That it was just prohibited. How do you think Penholster would affect that? Your Honor, under Pennsylvania v. Finley, there is no actual constitutional right to a collateral hearing itself. Thus, it can be governed in different ways. In Finley, the court specifically said it's so divorced from the main event, the trial. It's not the direct appeal. There is no right to counsel. And thus, I would have a difficult time answering that question, whether a state could absolutely preclude an evidentiary hearing. It has a very high standard. He was arguing a little while ago that California has an unusually – let's suppose it had an unusually high standard before it would have a hearing. A higher standard than the federal courts would have. Then why? You're never going to get a hearing. You just have a bunch of pieces of paper. I believe the standard would be the same. He would have to show a prima facie case. Now, he's supposed to do that on paper just to get past the prima facie burden and get an order to show cause. But this case is exactly like Penholster in that, in the end, the cases were the same. The evidence the California Supreme Court needed to make its decision was in front of the court. That's why the court said in Penholster that its order to show cause was improvidently granted, even though the court had issued the order to show cause and allowed Penholster an evidentiary hearing. It wouldn't matter, for example, whether Gray hired Grossi and said, don't tell me anything, just go talk to this guy, and if you find out that he has terrible mental health problems, I don't want to know about it. Or if he said, talk to him, and if you find anything I don't know, ask him if it's okay to tell me and then tell me. Wouldn't that make a difference as to whether he investigated or didn't investigate his mental health issues? Actually, Your Honor, no, because, and the district court cited its numerous reasons, because this was a strategic choice to not present such evidence, to not attack Sidney Cohen's testimony. How could he make that decision unless he knows what he would have found out? Suppose it turned out that Grossi's view was it wasn't, but suppose it was that this man has irretrievable, you know, longstanding schizophrenia, and he's completely divorced from reality, has no idea what he's talking about. Anything he tells you, you shouldn't believe a word he says, and nobody else should either. He hallucinates, he's engaged in fantasies all the time, and moreover, he was clearly legally insane at the time of the murders. But he didn't tell, and he found all that out through his treatment, but he didn't tell it to Gray because he was told not to. And that's not our case, Your Honor. Well, we don't know. I mean, we do know because Grossi even now doesn't say that, but suppose he did. If he didn't know that, if he had been told not to talk to him and not to tell him what he found, it would probably be the same thing as not having hired the expert in the first place. Right. But there's no evidence that he didn't talk to him. We have to take the record as it existed in front of the California Supreme Court. There's nothing that has ever presented Mr. Sully from going back to the California Supreme Court again and filing a new claim in a new petition, and I believe that would be a new claim. Well, it would be procedurally defaulted. It may well be procedurally defaulted, Your Honor, but that's the kind of thing where if he had some cause for it, some reason why he only now found out about this that was reasonable, maybe it would be excused. He's never done that. He's never come up with any evidence other than an attack on Dr. Cohen's testimony in an effort to show that, okay, you should have put on something different. Well, you should have spun the same evidence of cocaine abuse differently. This was a strategic decision. Well, I don't want to deteriorate from your argument, but I'm still puzzled about Penn Holster, if you don't mind, and how you think it plays out and how we ought to analyze it Under California procedure, if we conclude that the California Supreme Court has such a higher bar for getting an evidentiary hearing than we would have in the same federal court, if it's too high, or let's say, as I said, hypothetically, if they had no procedure for an evidentiary hearing, I assume that under that circumstance, you'd think that Penn Holster would allow a federal evidentiary hearing. Possibly, Your Honor. Maybe that would be one of the rare circumstances, but again, I think if there was new evidence, in order to consider the claim under D-1, or even under D-anything, it would have to go back to the state court. Now, I would disagree with that. Penn Holster itself says even if you get the evidence... Do you think the remedy would be that we would direct the California Supreme Court to issue an order to show cause to get a state evidentiary hearing? No, you'd have to remand the case to the state to consider this, as was done, I believe, in Upton. But if I can address the idea that Penn Holster does directly apply, it applies for two reasons. One, the California Supreme Court does not have a higher standard for IAC. The fact that it may have acknowledged Fretwell v. Lockhart in a couple of cases doesn't mean it applied Fretwell. Fretwell has never been overruled, but California Supreme Court has never actually applied a different standard. It has simply said we acknowledge there may be a different standard out there, but it's always applied the same standard. Hypothetically, if they were applying a higher standard, how would we review that? It may be the same as the Terry Williams v. Taylor case. If they were applying the wrong standard, but in this case, they are not. There's no evidence that the court is saying we are going to apply the higher fundamental fairness test in all cases, as opposed to just in Fretwell, where the defendant is not entitled to something that he was never legally entitled to in the first place. If his counsel fails to argue for something that he was never entitled to, it would not be fundamentally unfair if you precluded him from getting it. Now, in this particular case, this is just like Penn Holster, and the fact that a defendant follows the correct procedure, presents his evidence to the state court, and presents his evidence to the federal court, the same evidence, that doesn't take anything away from Penn Holster. That simply says we're following Penn Holster and Richter. Any further questions?  Thank you for your argument. Thank you, Your Honor. And we'll give you five minutes as you requested. The basic points that I've heard the prosecutor say is, first, that this was an excuse. The evidence about the mitigation, about mental health, and about what amounts to, perhaps, cocaine psychosis. If it wasn't a psychosis, he was in a blizzard. That that's just an excuse. And it's not an excuse. I mean, actually, if presented at guilt phase, it could result in a lower degree of murder in this case in California, which would make Mr. Sully ineligible for the death penalty. Also, at mitigation, as we've pointed out, this was powerful mitigation. You know, the prosecutor has found one case that talks about, and the district court judge relied on it, that talks about the equivocal nature of drug addiction. But most of the cases that talk about serious drug addiction, which is what Mr. Sully had, not occasional drug use, but serious drug addiction, find it very mitigating in connection, particularly, with mental health. Second, it is... One thing that strikes me about the record, about the showing, though, that you say you would make from Dr. Woods and others is, there's no direct connection to the murders. No, it doesn't have to be, though, in California. You don't have to actually mitigate, in the sense, there's no requirement that the mitigation addresses... Well, I understand that, but if it's not an explanation for the murders, you keep saying it's supposed to be an explanation. It is. Well, why is it an explanation of the murders? It's an explanation of the reason why he did it. Why? That he engaged in it in a time when he was impaired. He was impaired by mental health, and he was impaired by serious and pervasive drug usage. And so that is... I mean, just to play the devil's advocate for a minute, there are a lot of cocaine addicts in the world, and there aren't too many people who've done murders like this. There are a lot of murders in which cocaine, especially either freebasing or crack cocaine, which are very intense forms of cocaine usage, take place. And it is a recognized and common defense. Does it always prevail? Of course not. It's a question of presenting. The difference in the cocaine psychosis defense I see in this case and others is that often you see a cocaine psychosis defense that's related to one episode. And here you have many episodes over a long period of time. There's not just one bad night. There are many bad events in this. And so to my mind, it's a little less of a mitigating factor than it might be in, say, a single murder case, whereas there's robbery gone wrong or something like that. I recognize that, Your Honor. But also it's not just like bad judgment. This is not just bad judgment. This is... Or losing it at some point. If you believe the story and you don't believe his story, these are planned, complicated, covered-up murders where it wasn't just somebody who lost it one day because he had it organized to do it and he had it organized to dispense with the bodies in very creative and weird ways and so on. I recognize that. And I think all of that is all the more reason why that evidence can't be put down because what I believe the Attorney General, who I've known and respect for many years in this case, we've been opponents in this case very amicably for many, many years, it seems to me he doesn't grasp the real function of mitigation. It can't... It is not to excuse the crime. He wasn't trying to excuse the crime. He was trying to put it in context of what his life was. And if you don't investigate that, and I think without a hearing, no one will ever know, but what we have on the paper is... We still haven't figured out how to get back to the hearing under penalty. It's really a problem. Just to change the subject for a minute, I would like to know where in your briefs you made this California IAC claim, i.e., the California IAC standards are different. I don't remember reading it. Can I write you part of the letter on there? You can afterwards if you find it. You can let the court know or send a letter either way. I've read everything in the last couple of days. Thank you. Thanks for your argument. Thank you both. And we appreciate your patience with our case and our patience with our questions. So well argued and well briefed. The case will be submitted for decision.
judges: Thomas, Berzon, Smith